xx

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIAME CALDERON, an individual; RC, a minor child; MC, a minor child; MC, a minor child,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OF AMERICA; TULARE REGIONAL MEDICAL CENTER; LUIS A. SANCHEZ, D.O., and DOES 1 through 25, inclusive,<br><br>　　　　　　Defendants. | Case No. 1:17-cv-00040-BAM<br><br>ORDER DENYING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 108) |

　　　　Currently before the Court is Defendant United States of America's ("Defendant" or "United States") motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. (Doc. 108). Plaintiffs Jiame Calderon and his three minor children (collectively "Plaintiffs") filed their opposition, supporting declarations and exhibits on January 26, 2020. (Doc. 113). United States filed a reply on February 7, 2020.[1] (Doc. 113).

　　　　On February 21, 2020, the Court held a hearing on the motion before the Honorable Barbara A. McAuliffe, United States Magistrate Judge.[2] Counsel Raymond Chandler appeared by telephone on behalf of Plaintiffs. Assistant United States Attorney Jeffrey Lodge appeared on behalf of Defendant United States. Counsel Alan Mish appeared on behalf of Defendant Dr.

---

[1]　　Defendant Dr. Luis A. Sanchez did not join in the motion for summary judgment or file an opposition to the motion.
[2]　　The parties in this action have consented to the jurisdiction of the United States Magistrate Judge for all purposes pursuant to 28 U.S.C.§ 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305. (Docs. 7, 11, 66).

1

Luis A. Sanchez.

Having considered the record, the parties' briefing and arguments, and the relevant law, the Court denies Defendant's motion for summary judgment.

**I.  Introduction**

This suit is a wrongful death action stemming from the death of decedent Ana Calderon ("Ana") on October 17, 2015. *See generally* Third Amended Complaint ("TAC"), Doc. 81. On October 13, 2015, Ana gave birth to her third child with Plaintiff Jiame Calderon at the Tulare Regional Medical Center ("TRMC"). There were no complications. TAC at ¶ 17. FAC at ¶ 15. The following day, on October 14, 2015, Ana underwent a tubal ligation surgery performed by Adanna Ikedilo, M.D., an employee of Defendant United States. TAC at ¶¶ 11, 18. Ana was in good health when the tubal ligation began. TAC at ¶ 19. The tubal ligation procedure ended at approximately 11:11 a.m. TAC at ¶¶ 18, 19.

According to the amended complaint, during the tubal ligation surgery and/or shortly thereafter, significant changes to Ana's vital signs occurred, including a significant drop in her blood pressure and a significant increase in her heart rate. TAC at ¶ 20. Plaintiffs allege that Dr. Ikedilo transected an artery during the tubal ligation procedure, which caused massive internal bleeding and a life-threatening decrease in oxygen flow to vital organs, including the brain, and was not in accordance with the applicable standard of care. TAC at ¶ 21. Plaintiffs also allege that during and/or shortly after the tubal ligation surgery, Luis A. Sanchez, D.O., the physician who administered anesthesia to Ana during the tubal ligation surgery, failed to properly monitor Ana's vital signs, failed to inform Dr. Ikedilo of the significant changes to Ana's vital signs, failed to diagnose the cause of such changes in vital signs and failed to treat such changes in accordance with the applicable standard of care. TAC at ¶¶ 13, 22.

On October 14, 2015, at approximately 12:04 p.m., while still in the operating room, Ana suffered her first cardiac arrest (code blue). During the code, Dr. Ikedilo was paged to return to the operating room but did not return until shortly before 1:00 p.m. TAC at ¶¶ 23-24. Despite obvious signs of internal bleeding, exploratory surgery to find the source of and treat the bleeding did not begin until approximately 1:00 p.m. The first of two exploratory laparotomies

2

to find and treat the cause of the bleeding was performed by Dr. Ikedilo from approximately 1:00 p.m. to 2:15 p.m. on October 14, 2014. TAC at ¶¶ 25-26. Ana was transferred to the Intensive Care Unit (ICU) after the first exploratory laparotomy. While in the ICU, Ana suffered a second cardiac arrest (code blue) at approximately 6:06 p.m. Ana was taken to the operating room where a second exploratory laparotomy was performed from approximately 6:17 p.m. to 8:17 p.m. by Dr. Ikedilo and Dr. Rebecca Zulim. TAC at ¶¶ 27-29.

Ana never regained consciousness after the tubal ligation and as a result of the internal bleeding, she suffered irreversible anoxic brain injury. On or about October 17, 2014, Ana was transferred to California Pacific Medical Center where she expired shortly thereafter. TAC at ¶¶ 30-31.

Plaintiffs proceed on their third amended complaint for wrongful death against the United States as the deemed employer of the surgeon, Dr. Ikedilo, and against the anesthesiologist, Dr. Sanchez, arising from Ana's tubal ligation on October 14, 2015. (Doc. 108-14; Undisputed Material Fact ("UMF") 1.) Plaintiffs designated Dr. Howard C. Mandel as their expert witness regarding the standard of care of the surgeon. UMF 2. Dr. Mandel gave his expert medical opinion that the surgeon, Dr. Ikedilo, did not meet the standard of care in five (5) ways: (1) in the tubal ligation surgery, failing to ligate dissected blood vessel(s), resulting in intra-peritoneal hemorrhage; (2) in the tubal ligation surgery, failing to properly check the integrity of the ties and for bleeding after the tubes are placed back inside the body at the end of the surgery; (3) failure to quickly reopen the tubal ligation incision and treat the causes of bleeding before leaving TRMC; (4) in the first laparotomy, leaving the left and right medial segments of the Fallopian tubes as well as all of the uterine artery tributaries to the mesosalpinges un-ligated; and (5) in the first laparotomy, interrupting an artery during the insertion of the Jackson-Pratt drain, causing yet another source of bleeding. (Doc. 108-8 at 59-72, Ex. 5 to Declaration of Jeffrey J. Lodge ("Lodge Decl."), Original Expert Report of Howard C. Mandel, M.D., F.A.C.O.G. ("Mandel Report").

Plaintiffs also designated Dr. Keith Kimble as their expert witness regarding the standard of care of the anesthesiologist. UMF 3. Dr. Kimble gave his expert medical opinion that the

anesthesiologist, Dr. Sanchez, did not meet the standard of care for an anesthesiologist in six (6) ways, including: (1) failure to warn Dr. Ikedilo that he was concerned about Ana Calderon's vital signs; (2) extubating while Ana Calderon was still in an emergency situation; (3) failure to rapidly administer sufficient fluids; (4) failure to administer adequate pressor medication; (5) failure to timely seek help; and (6) failure to properly diagnose Ana Calderon's condition. UMF 4.

The United States argues that Dr. Ikedilo competently performed the tubal ligation and was not the cause of Ana's death, instead placing the focus on Dr. Sanchez' conduct. By this motion, the United States seeks to exclude Dr. Mandel's opinions and testimony, arguing that they are unreliable because they failed to consider Dr. Sanchez' performance and are therefore inadmissible. Without Dr. Mandel's opinions, the United States claims that Plaintiffs cannot rely on the opinion of Dr. Sanchez' medical expert on surgery, Dr. Nancy Mason, and are therefore without the evidence necessary to establish medical negligence against the United States under the Federal Tort Claims Act ("FTCA").

## II.     Background[3]

### A.     Tubal Ligation

Ana was admitted to TRMC for labor and delivery on October 13, 2015. (Doc. 108-4, Ex. 1 to Lodge Decl., Deposition of Dr. Ikedilo ("Ikedilo Depo."), 37:8-39:6; TRMC 000101. She delivered a healthy baby, MC, with the assistance of an on-call physician. *Id.* Ana was scheduled for tubal ligation surgery with Dr. Ikedilo the following morning on October 14, 2015. *Id.*, Ex. 000101. Dr. Sanchez was assigned to provide anesthesia services. (Doc. 108-6, Ex. 3 to Lodge Decl., Deposition of Dr. Sanchez ("Sanchez Depo."), 21:6-24:17.

On October 14, 2015, Ana was transported from the labor recovery room to the pre-operating room to prepare for the tubal ligation. Sanchez Depo., 168:15-172 and Ex. 1 (TRMC

---

[3] This background is derived from the United States' motion for summary judgment. Plaintiffs do not dispute the sequence of the main events as described in the United States' motion: the tubal surgery, the first code blue, the first exploratory laparotomy to find the source of bleeding, the second code blue in ICU due to rebleeding, and return to the OR for second exploratory laparotomy. The facts and events delineated here are considered only for purposes of resolving the instant motion. Disputed facts relevant to the instant motion are noted.

4

000475). Dr. Sanchez conducted a pre-anesthetic evaluation at 0954. *Id.* In the pre-operation room, her blood pressure ("BP") was 115 over 64 and her pulse or heart rate ("HR") was 73. *Id.* at 55:9-22 and Ex. 2. Dr. Sanchez determined that Ana was healthy enough for anesthesia. *Id.* at 39:20-40:9. At 1000, Dr. Ikedilo also examined Ana and cleared her for surgery. TRMC 000101.

Ana was received in the operating room at 1015. Sanchez Depo. at Ex. 2. Her pre-induction BP had increased to 149 over 85. *Id.* at 99:9-100:5. Dr. Sanchez attributed this to pre-surgery nervousness. *Id.* at 102:8-13. He began administration of anesthesia at 1018. *Id.* at Ex. 2. He inserted the intubation tube at 1025. *Id.* at 100:14-17.

Ana's BP began to fall. Sanchez Depo., 100:21-23, Ex. 2. By 1035 it had dropped to 101 over 57. *Id.* at 102:14-103:9. An alarm went off. *Id.* at 105:10-12. Dr. Sanchez believes the BP monitor is set to alarm under 90 systolic and HR over 100. Id. at 121:20-122:11. He determined that hypovolemia, in combination with anesthesia drugs, caused her BP to decrease.[4] *Id.* at 113:14-114:3; 102:22-103:9. Dr. Sanchez did not note hypovolemia in the record. Id. at Ex. 2.

Dr. Sanchez did not discuss the drop in blood pressure with Dr. Ikedilo, but he "might have" told Dr. Ikedilo, "'Your patient is very dry,' maybe" indicating some level of hypovolemia. Sanchez Depo., at 105:10-21,104:15-20, 115:4-12, 122:17-123:9. Dr. Sanchez administered phenylephrine to bring the blood pressure back up. *Id.* at 106:11-20, 118:4-23. Ana's BP rose to 139 over 70 by 1045. *Id.* at 111:8-11. Dr. Sanchez did not note the administration of phenylephrine in the record. *Id.* at 84:10-12; Ex. 2.

Dr. Sanchez also noted that the oxygen in Ana's blood, i.e. her SpO2, had dropped. Sanchez Depo., 110:11-24, Ex. 2. SpO2 is the peripheral capillary oxygen saturation, an estimate of the amount of oxygen in the blood. See https://www.webmd.com/lung/pulse-oximetry-test#1. Dr. Sanchez adjusted the intubation tube and Ana's oxygen levels returned to normal. Sanchez Depo., 110:11-24. Dr. Sanchez did not note the adjustment of the intubation tube in the record. *Id.* at Ex. 2. Dr. Ikedilo was aware of Ana's hypotensive status and reintubation prior to surgery. Ikedilo Depo., 31:8-24.

---

[4] Hypovolemia is an abnormal decrease in the volume of blood plasma that occurs with dehydration or bleeding. See https://www.medicinenet.com/script/main/art.asp?articlekey=3871.

1 | Dr. Sanchez concluded it was appropriate for surgery to start. Sanchez Depo., 115:10-12, 185:2-18. Surgery started at 1044. *Id.* at 115:13-15, Ex. 2. Dr. Sanchez continuously monitored Ana's vital signs and recorded them every five minutes. *Id.* Ana's BP began to drop. *Id.* at 116:16-117:6. Dr. Sanchez worked to maintain a "seminormal" blood pressure by increasing the rate of fluids and continued use of phenylephrine. *Id.* Without the phenylephrine, Ana's BP would have been even lower. Id. at 118:5-12. He knew that an increase in heart rate and decrease in blood pressure could be caused by blood loss, but he did not believe Ana was bleeding at that time. *Id.* at 119:17-25. He did not discuss Ana's vital signs with Dr. Ikedilo. *Id.* at 120:2-25. Dr. Sanchez did not record any of the doses of phenylephrine in the anesthesia record. *Id.* at 197:18-25. At the end of surgery, Ana's heart rate was 95, and her blood pressure was safe. Sanchez Depo., 122:12-16, 118:13-119:20.

Dr. Ikedilo performed the tubal ligation using the Parkland method. Ikedilo Depo., TRMC 000133-34. Dr. Ikedilo secured ties on both fallopian tubes and confirmed that there was "excellent hemostasis" i.e. no bleeding. *Id.* Dr. Ikedilo made a hand written post-surgical note estimating total blood loss during surgery at 5 ml. *Id.* at 51:21-52:1; TRMC 000165. There is a dispute regarding the timing and reasons for this note, including an assertion that the note was made prior to completion of the surgery, and there was no need for the note if the surgeon intended to return to the operating room. (*See* Doc. No. 113 at 12-113 Mandel Report at 63.)

Dr. Ikedilo left the operating room to talk to Ana's family. Second Ikedilo Depo., 38:10-17. Dr. Ikedilo met with Jiame Calderon and they talked less than 10 minutes. *Id.* at 41:3-11, 40:16-21. Ana was still in the OR. *Id.*

There is a dispute as to whether Dr. Ikedilo went back to the operating room area. Ikedilo Depo., 40:3-24. Sanchez Depo., 188:6-18. At some point, Dr. Ikedilo received a non-emergency call that another patient was in labor at a nearby hospital, Kaweah Delta, where she was on-call. *Id.* at 40:25-41:14, 57:15-24. Dr. Ikedilo left to deliver the baby at Kaweah Delta. *Id.* 57:15-24. Ana remained in the care of Dr. Sanchez as well as a circulating nurse and an OR tech. Sanchez Depo., 135:17-136:16.

///

### B. Post-Tubal Ligation Treatment

While in the care of Dr. Sanchez, Ana started to regain consciousness at 1125 or 1130, and sat up. Sanchez Depo., 140:20-16, 142:14-143:13. At approximately 1130, Dr. Sanchez noted that her EKG rhythm (which measures the electrical activity of the heartbeat) changed from SR (sinus rhythm) to ST (sinus tachycardia). *Id.* at 153:11-155:14. Dr. Sanchez continued to treat Ana for another 30 minutes. *Id.* at 145:4-16. At approximately 1204, Ana stopped breathing and had no pulse. *Id.* at 146:12-15. Dr. Sanchez called a Code Blue. Id. at 147:19-25. A Code Blue indicates that a cardiopulmonary arrest is happening to a patient in a hospital or clinic, requiring a team of providers (sometimes called a code team) to rush to the specific location and begin immediate resuscitative efforts. *See* medicinenet.com. Dr. Sanchez believed Ana had a pulmonary embolism. *Id.* at 188:6-13. Several doctors responded to the Code Blue including Emergency Room doctor, Dr. Marc Martinez. TRMC 000117. The response team resuscitated Ana and ran tests. *Id.*

At 1215 or 1220 Dr. Sanchez asked for a call to be placed to Dr. Ikedilo. Sanchez Depo., 161:12-24. Dr. Ikedilo received a message as she was finishing the delivery of the baby at Kaweah Delta. Second Ikedilo Depo., 41:25-43:24. She immediately returned to TRMC which was about a ten-minute drive. *Id.*

### C. Exploratory Laparotomy

Upon Dr. Ikedilo's arrival at TRMC, the medical team soon discovered that Ana's abdomen was distended and full of fluid and Dr. Ikedilo prepared for an emergency exploratory laparotomy. (Doc. 108-8 at 12-13.) Dr. Sanchez remained as the anesthesiologist. Sanchez Depo., 163:2-18; TRMC 000125-126.

Dr. Ikedilo performed the surgery with the assistance of Dr. Gupta. Second Ikedilo Depo., 47:9-17: Ex. 000125. Dr. Rebecca A. Zulim was also present to work on supplying blood products. Id. at 48:16-49:16. Dr. Ikedilo identified massive wide-spread bleeding the color and viscosity of grape Kool-Aid. Id. at 49:20-51:19. Dr. Ikedilo determined that Ana had developed disseminated intravascular coagulation ("DIC"). Id. at 50:15-13. DIC is a rare but serious condition that causes abnormal blood clotting throughout the body's blood vessels; symptoms

may include bleeding, bruising, low blood pressure, shortness of breath, or confusion. https://www.nhlbi.nih.gov/health-topics/disseminated-intravascular-coagulation. Dr. Ikedilo was unable to identify a significant discrete source of blood loss. Second Ikedilo Depo., 49:20-51:19; see also Ikedilo Depo., 66:5-13. It is disputed whether Dr. Ikedilo confirmed that the ties remained secure on the fallopian tubes. Second Ikedilo Depo., 50:7-9; Mandel Report at 64-65.

Dr. Ikedilo and the medical team addressed the bleeding with a massive transfusion. Ikedilo Depo., 63:14-65:1; TRMC 000125. Dr. Ikedilo identified a slow ooze of blood from the area of the left mesosalpinx but no arterial bleeding. *Id.* To address this bleeding, Dr. Ikedilo performed an oophorectomy and fimbriectomy, or removal of the ovary and fallopian tissue located close to the ovary. *Id.* She applied "arista and snow" which are topical hemostatic agents to reduce bleeding. *Id.* As a result, Dr. Ikedilo was able to stabilize the bleeding. Id. Dr. Ikedilo was concerned about further bleeding due to DIC and placed a JP drain in Ana's abdomen so they could discover any additional bleeding. Id. Ana's condition was stable but guarded and she remained intubated and sedated as she was transferred to the ICU at 1451. *Id.*; Sanchez Depo., 162:2-8; TRMC 000135.

Dr. Ikedilo continued to monitor Ana's condition including blood tests every one to two hours to check for additional bleeding. Second Ikedilo Depo., 53:19-55:23. Dr. Ikedilo received a lab report showing that Ana was bleeding again. *Id.* Dr. Ikedilo rushed back to the hospital. *Id.* Ana had another Code Blue. *Id.*

### D. Second Laparotomy

Ana was again in DIC. Second Ikedilo Depo., 55:24-58:14; TRMC 000123. Dr. Ikedilo performed another laparotomy to stop the bleeding. *Id.* Dr. Sanchez was replaced by Dr. Palacios to provide anesthesia. Sanchez Depo., 176:6-10; TRMC 000140. Dr. Ikedilo was assisted by Dr. Pang and Dr. Zulim. Second Ikedilo Depo., 57:16-58:14; TRMC 00096. Dr. Ikedilo was unable to identify a significant discrete source of blood loss. Second Ikedilo Depo., 56:4-11. Dr. Ikedilo patched many diverse bleed sites including the omentum, which is a curtain of fatty tissue that hangs down from the stomach. Ikedilo Depo., 67:5-15; see also TRMC 00123 The major source of bleeding was the site of the JP drain, which was removed and oversewn. *Id.* The doctors

stopped the bleeding. *Id.* Surgery ended at 2000 and Ana was taken to ICU, intubated but stable. TRMC 000140.

Ana remained in critical condition, with signs of anoxic brain injury. TRMC 000096-99. Because there was nothing more they could do, arrangements were made to airlift Ana to California Pacific Medical Center in San Francisco. *Id.* Ana was transferred on October 17, 2015, and despite the efforts at California Pacific Medical Center, she passed away on October 24, 2015.

Dr. Ikedilo asked for an independent review to try to determine what happened. Ikedilo Depo., 76:7-77:12. TRMC did not act on Dr. Ikedilo's request for an investigation. *Id.* TRMC subsequently filed for bankruptcy on September 30, 2017, and closed. (Doc. 22.)

**II. Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S.

at 323, 106 S.Ct. 2548). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

**IV.  Discussion**

As indicated, the United States contends that Plaintiffs' standard of care expert, Dr. Mandel, should be excluded and summary judgment should be granted because Plaintiffs are unable to establish a *prima facie* case of medical negligence against Dr. Ikedilo. The United States also asserts that with the exclusion of Dr. Mandel's expert opinion, Plaintiffs also cannot rely on the opinion of Dr. Sanchez' designated medical expert, Dr. Nancy Mason.

In cases arising under the FTCA, the law of the state where the alleged misconduct

occurred governs substantive tort liability. *Richards v. United States*, 369 US. 1, 11 (1962). In California, the elements a plaintiff must prove for a negligence action based on medical malpractice are: "(1) a duty to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) resulting loss or damage." *Johnson v. Superior Court*, 143 Cal.App.4th 297, 305, 49 Cal.Rptr.3d 52 (2006); *Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999) (same). "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson." *Johnson*, 143 Cal.App.4th at 305, 49 Cal.Rptr.3d 52 (internal citations omitted).

"California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." *Hanson*, 76 Cal.App.4th at 607, 90 Cal.Rptr.2d 396 (emphasis added).

In contending that Plaintiffs fail to state a *prima facie* case, the United States asserts that Dr. Mandel's opinions are inherently unreliable and are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 125 L.Ed.2d 469, (1993). Specifically, and as noted above, the United States claims that Dr. Mandel's opinions are unreliable because they fail to consider the conduct of the anesthesiologist and its impact on Dr. Ikedilo's conduct. The United States also claims that Dr. Mandel's opinions are based on speculation, false assumptions and incorrect data.

Federal Rule of Evidence 702 ("Rule 702"), which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (**a**) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue: (**b**) the testimony is based on sufficient facts or data; (**c**) the testimony is the product of reliable principles and methods; and (**d**) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject and the proposed testimony is supported by good grounds, and relevant, in that it will assist the trier in determining a fact in issue. *Daubert*, 509 U.S. at 589-92. The Court's role in weighing expert opinions against these standards of reliability and relevancy is that of a "gatekeeper" to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "However, the gatekeeping function is less pressing where, as here, the court sits as the trier of fact in place of a jury." *Crane-Mcnab v. Cty. of Merced*, No. CIV. 1:08-1218, 2011 WL 94424, at *1 (E.D. Cal. Jan. 11, 2011) (citing *In re Salem*, 465 F.3d 767, 777 (7th Cir.2006) ("Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make [Daubert] decisions prior to hearing the testimony is lessened.") and *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.2005) ( "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."). "In bench trials, the district court is able to 'make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.'" *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (citation omitted).

In light of this standard, and because the claims against the United States will be the subject of a bench trial, the Court intends to admit the evidence from Dr. Mandel, subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability required by Federal Rule of Evidence 702. That said, the Court addresses the arguments forwarded by the United States, including the argument that Dr. Mandel's opinion is inherently

unreliable because he disregarded the conduct of the anesthesiologist in rendering his expert opinion and that Dr. Mandel reached his conclusions by disregarding material evidence and by creating a false narrative. (Doc. No. 108-1 at 22.)

The crux of the United States' position is that Dr. Mandel's opinion should be excluded because he disregarded the conduct of the anesthesiologist. To support this position, the United States cites, among other things, testimony from Dr. Mandel's deposition in which Dr. Mandel confirms that his opinions and report did not analyze how the alleged failures Dr. Sanchez, the anesthesiologist, impacted the performance of others in this case. Mandel Depo., 84:7-16. He also confirmed that he did not focus on Dr. Kimble's expert report regarding the conduct of the anesthesiologist. *Id.* at 86:5-87:10.

The Court is not persuaded that Dr. Mandel's opinion should be excluded as inherently unreliable on this basis. Dr. Mandel was retained to "evaluate the standard of care provided to Ana Calderon by Dr. Adanno Ikedilo on October 14, 2015 in regards to a bilateral tubal ligation and subsequent exploratory surgeries to control bleeding." Mandel Report at 61. The United States does not dispute that Dr. Mandel is qualified to render an expert opinion regarding the surgical standard of care under Federal Rule of Evidence 702. Dr. Mandel is Board Certified in Obstetrics and Gynecology with over 35 years of experience in managing patients in his field. Mandel Report at 60. In rendering his opinion, Dr. Mandel reviewed Ana's medical records from TRMC, including the anesthesia record from Dr. Sanchez and Dr. Sanchez' deposition testimony. *Id.* at 61, 63-65. Dr. Mandel then identified whether Dr. Ikedilo's actions fell below the standard of care with respect to any of her independent duties. Dr. Mandel confirmed at his deposition that any negligence of the anesthesiologist had no impact on his opinion that Dr. Ikedilo failed to meet the standard of care. Mandel Depo., 82:24—86:2. For instance, Dr. Mandel identified Dr. Ikedilo's independent duty to Ana separate from that of Dr. Sanchez following the tubal ligation surgery. *Id.* at 65 ("[E]ven if Dr. Sanchez never directly warned Dr. Ikedilo of Ana's condition, Dr. Ikedilo should have known that Ana was not stable. Dr. Ikedilo had an independent duty to check the vital signs before leaving the hospital."). Dr. Mandel also opined that Dr. Ikedilo's conduct during the first laparotomy fell below the standard of care.

Mandel Report at 66-68. Although Dr. Sanchez participated in the first laparotomy, there is no apparent allegation that his conduct during the procedure fell below the standard of care. Moreover, the Court is not persuaded that Dr. Mandel's opinion regarding Dr. Ikedilo's conduct should be excluded at this juncture given evidence that Ana suffered a hemorrhage and bleeding caused by the tubal ligation surgery. (*See, e.g.*, Doc. 108-11, Ex. 8 to Lodge Decl., Report of Dr. Edward T. Riley at 16; Doc. 108-10, Ex. 7 to Lodge Decl. Report of Nancy E. Mason, MD, FACOG at 28).

As an additional matter, the United States claims that Dr. Mandel's opinion should be excluded because he relies on the "captain of the ship" doctrine. (Doc. No. 108-1 at 23.) The "captain of the ship" doctrine has been recognized in California state law malpractice claims for decades. *Baumgardner v. Yusef*, 144 Cal.App.4th 1381, 1397, 51 Cal.Rptr.3d 277 (2006). It recognizes a surgeon's liability for the actions of others working under his supervision and control during the operation. *Id.* at 1396. The "captain of the ship" doctrine is a negligence standard that is based upon the doctrine of respondeat superior. *Id.* Here, however, Plaintiffs have not alleged respondeat superior liability or vicarious liability. Rather, Plaintiffs' contention, for which they rely on Dr. Mandel's opinion, is that Dr. Ikedilo had independent duties separate and apart from those of the anesthesiologist, Dr. Sanchez. Indeed, Dr. Mandel, when using the "captain of the ship" phrase, expressly testified that the surgeon has independent duties, not that the surgeon was liable for the conduct of others. Mandel Depo., 90:24-91:16.

The United States also takes issue with Dr. Mandel's opinion that Dr. Ikedilo's alleged failure to check for bleeding after the tubes were placed back inside the body was below the standard of care. The United States contends that Dr. Mandel created a false narrative in which he assumed ties were "knocked off" the fallopian tubes, in contradiction of Dr. Ikedilo's testimony, and he unreasonably interpreted the medical record to conclude that Dr. Ikedilo did not check for bleeding before closing including Dr. Ikedilo's handwritten report showing only 5 ml blood loss, which was confirmed by the OR report and her deposition testimony. (Doc. No 108-1 at 22, Ikedilo Depo. 63:14-68:125 and 58:15-62:19).

Plaintiffs explain that in the mini-laparotomy performed by Dr. Ikedilo, the first fallopian

tube was brought outside of the body through a small incision, whereby a section of tube was removed (ligated) and the cut ends were tied off with a "free tie." The tube was checked for bleeding and then pushed back into the abdomen through the incision. This process was then repeated with the second tube. Doc. 113 at 8; TRMC 00133-34. A free tie differs from a suture in that it is "looped" around the tube, not "anchored" to the tube by sewing through the tube with a needle. (Doc. No. 108-12, Ex. 9 to Lodge Decl., Deposition of Charles March, M.D. ("March Depo."), 28:7-22).

Plaintiffs assert that Dr. Mandel concluded that one or more of the free ties came off *after* Dr. Ikedilo pushed them back inside the abdomen. Dr. Mandel reportedly based this conclusion on his own experience, stating that it is not uncommon for a tie to slip off and therefore checking for bleeding after the tubes are placed back inside is critical.[5] (Doc. No. 113 at 9; Mandel Report at 63). Dr. Mandel also reportedly based his opinion on Dr. Ikedilo's Operative Report of the tubal surgery, written hours after the surgery ended, stating that Dr. Ikedilo checked the tied ends of the tubes for bleeding before she pushed the tubes inside, not after. Mandel Report at 63. Dr. Mandel additionally observed that while Dr. Ikedilo claimed that the ties were still intact when she opened the abdomen during the second laparotomy, that claim did not appear until Dr. Ikedilo's second deposition, taken years after Ana's death. Mandel Depo. at 69:16-70:9; Second Ikedilo Depo., 57:13-15. That claim also did not appear in the Operative Reports. TRMC 133-34; 123-124; 125-126.

The United States relies on Dr. Ikedilo's handwritten post-op report showing only 5 ml blood loss to support the contention that Dr. Ikedilo checked for bleeding after the tubes were reinserted. TRMC 00165. However, Plaintiffs question the timing of Dr. Ikedilo's Post-Op Note, claiming that Dr. Ikedilo's note was completed at 11:00, when surgery did not conclude until 11:11. TRMC 00165; 000143. Plaintiffs also question the reason for the note, stating that it was unnecessary if Dr. Ikedilo intended to return to the OR as she asserts. (Doc. No. 108-12, Ex. 9 to Lodge Decl., March Report at 22.)

---

[5] As Plaintiffs point out, the United States' own expert opined that the failure to check for bleeding after the tubes are placed back inside is below the standard of care and that if a tie came off or became loose, it could have caused bleeding. March Depo., 18:2-8; 40:10-41:1.

15

The United States also contends that Dr. Mandel incorrectly assumed that the alarms on Ana's monitors went off during surgery. (Doc. 108-1). At issue here is Dr. Mandel's opinion that Dr. Ikedilo had an independent duty to check Ana's vital signs before leaving the hospital. Dr. Ikedilo claimed that she returned to the operating room after speaking with Mr. Calderon, but Dr. Sanchez disputes this claim. Dr. Mandel believes that if Dr. Ikedilo had returned, then alarms would have been sounding because, at the approximate time, Ana's blood pressure had fallen below 90mmHg systolic, the point at which the anesthetic alarms were set to sound. Mandel Report at 64-65. In any event, whether or not she returned to the operating room, Dr. Mandel opined that Dr. Ikedilo had an independent duty to check the vital signs before leaving the hospital, even if Dr. Sanchez did not warn her of the condition. *Id.*

The Court finds that there are genuine disputes about whether any of the ties were knocked off, whether Dr. Ikedilo checked for bleeding after she pushed the tubes back inside or whether she returned to the operating room after speaking to Mr. Calderon. In light of these disputes, the Court cannot conclude on the present record that the opinions of Dr. Mandel regarding the tubal ligation are based on insufficient facts and data. Dr. Mandel opines, based upon his years of experience and practice, Dr. Ikedilo's surgical conduct fell below the standard of care, irrespective of the anesthesiologist's actions.[6] His opinions are medically related to his expertise and the standard for performance of surgical duties. His expert opinion is relevant and based upon reliable scientific methodology given the experts' academic and professional experience and the nature of his opinion. To the extent the United States challenges the factual basis of Dr. Mandel's opinions, this challenge goes to the weight of the evidence rather than admissibility. *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in

---

[6] As noted throughout this Order, the evidence submitted for this motion is replete with expert opinions, from which a reasonable jury could conclude, that Dr. Sanchez's conduct fell below the standard of care before, during and after the tubal ligation surgery, which may have complicated or contributed to Dr. Ikedilo's surgical difficulties. Nonetheless, this motion seeks to exclude the purported unreliable opinions of Dr. Mandel. The evidence, at this point of the case, demonstrates that Ana died from hemorrhaging and complications of postpartum tubal ligation, and Dr. Mandel explains how that could have happened.

cross-examination.") (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)).

**IV.     Conclusion and Order**

For the reasons stated, Defendant's motion for summary judgment, filed on January 10, 2020, is HEREBY DENIED.

IT IS SO ORDERED.

Dated:    **February 24, 2020**              /s/ *Barbara A. McAuliffe*
                                            UNITED STATES MAGISTRATE JUDGE